**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**ERIC BOWMAN,**

                    **Plaintiff,**              **1:12-cv-306**
                                                **(GLS/RFT)**

          **v.**

**CSX TRANSPORTATION, INC.,**

                    **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Smith, Hoke Law Firm                       JOHN J. HOKE, ESQ.
18 Corporate Woods Boulevard
Suite 202
Albany, NY 12211

**FOR THE DEFENDANT:**
Nixon, Peabody Law Firm                    SUSAN C. RONEY, ESQ.
Key Towers at Fountain Plaza               LYNNETTE NOGUERAS-
40 Fountain Plaza                          TRUMMER, ESQ.
Suite 500
Buffalo, NY 14202

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Eric Bowman commenced this action under the Family and

Medical Leave Act (FMLA)[1] against defendant CSX Transportation, Inc. (CSXT), seeking damages related to his employment with CSXT. (Compl., Dkt. No. 1.) Bowman contends that CSXT interfered, restrained, and denied him his rights and retaliated against him in violation of the FMLA. (*Id.* ¶¶ 16-23, 24-27.) Pending before the court is CSXT's motion for summary judgment, (Dkt. No. 17), and CSXT's letter motion requesting oral argument on its motion for summary judgment, (Dkt. No. 16). For the following reasons, the motion for summary judgment is granted, and the letter motion requesting oral argument is denied as moot.

## II. Background[2]

## A. Bowman's Employment at CSXT Generally

On October 16, 2006, Bowman began working for CSXT as an

_____

[1] *See* 29 U.S.C. §§ 2601-2654.

[2] CSXT submitted a Statement of Material Facts in support of its motion for summary judgment. (Dkt. No. 17, Attach. 28.) Bowman properly responded to the Statement and submitted a Counter-Statement of Material Facts. (Dkt. No. 21, Attach. 31.) Accordingly, to the extent supported by the record, the background set forth in this section is taken from: (1) CSXT's Statement of Material Facts and Bowman's responses thereto; (2) Bowman's Counter-Statement of Material Facts and CSXT's responses thereto; (3) the admissible exhibits and evidence submitted by CSXT in support of its motion for summary judgment; and (4) the exhibits and evidence submitted by Bowman in opposition to CSXT's motion for summary judgment. Unless otherwise noted, the facts are undisputed.

Assistant General Car Foreman. (Def.'s Statement of Material Facts (SMF) ¶ 1, Dkt. No. 17, Attach. 28.) Bowman's duties generally included completing certain reports, conducting safety meetings, and supervising other employees. (*Id.* ¶ 2.) Beginning in January 2008, Matthew Sams became Bowman's immediate supervisor. (*Id.* ¶ 3.) Sams' supervisor was Jeff Hensley. (*Id.*) Hensley's supervisor was Don Murphy. (*Id.* ¶ 35.)

From the beginning, Bowman and Sams' working relationship was "very uncomfortable," due primarily to "friction" over Sams' policy changes. (*Id.* ¶ 4; Dkt. No. 17, Attach. 2 at 30-31.) Their relationship took a turn for the worse, however, shortly after Bowman filed an ethics complaint against Sams in May 2009, stating that Sams came to work looking "like he had been out partying all night" and requesting that Sams "be sent out for a mental evaluation." (Dkt. No. 17, Attach. 2 at 31; Dkt. No. 17, Attach. 4 at 2; Def.'s SMF ¶ 5.) Indeed, at his deposition, Bowman stated that his working relationship with Sams was "hostile" and "very negative." (Dkt. No. 17, Attach. 2 at 28.)

## B. Bowman's Performance Management Reports

Throughout the course of his employment, Bowman received Performance Management Reports (PMR), which included his numerical

scores in various performance categories and manager comments for both his mid-year and end-of-year performances.  (*See, e.g.*, Dkt. No. 17, Attach. 5.)  Generally, Bowman's scores were average, typically rating twos and threes on a four-point scale.  (Pl.'s Counter SMF ¶ 3, Dkt. No. 21, Attach. 31 at 7-14.)  Many comments in the PMRs, from 2008 through 2010, indicate that Bowman's conduct was not always professional, his judgment was sometimes questionable, he struggled with accepting constructive criticism, his working relationships with his supervisors and colleagues were strained—at times, even combative—and that he often failed to perform his job duties satisfactorily.[3]  (*See, e.g.*, Dkt. No. 17, Attach. 5 at 7; Dkt. No. 17, Attach. 6 at 7, 8; Dkt. No. 17, Attach. 8 at 4-5, 10-11, 13-14.)  Although Bowman's performance seemed to improve between mid-2009 and the end of 2009, as reflected by the manager

---

[3] For example, in his 2008 PMR, Hensley noted that Bowman demonstrated "bad conduct at times when . . . questioned on certain business concerns" and admonished Bowman that he "must remember that [his] supervisor has the last word when it comes to production and scheduling work."  (Dkt. No. 17, Attach. 5 at 8.)  Further, although by the end of the year he showed improvement in this area, in mid-2009, Hensley remarked that Bowman "showed poor attitude and an inability to accept constructive criticism and positive corrective action when confronted with mistakes and poor decisions that resulted in problems."  (Dkt. No. 17, Attach. 6 at 7.)

comments in his 2009 PMR, (Dkt. No. 17, Attach. 7 at 7-8), his 2010 PMR demonstrates that both his performance and behavior significantly worsened throughout 2010, (*see generally* Dkt. No. 17, Attach. 8).[4]

## C. Bowman's Employment at CSXT Throughout 2010

Throughout 2010, Bowman had more confrontations with co-workers and received several emails regarding inadequate job performance. (Def.'s SMF ¶¶ 9-23.) First, in May 2010, trainmaster Jeremy Sequin filed a statement with CSXT memorializing a phone conversation he had with Bowman, in which Bowman raised his voice and used profanity. (*Id.* ¶ 9;

---

[4] To illustrate, Hensley's comments in Bowman's 2010 PMR include: "[Bowman] does not take the step to fix . . . problem[s] or safety concern[s]," "[Bowman] has not used good judgment on placement of employees to meet business demands . . . [and] [h]e does not perform his areas of responsibility in a timely manner," "[t]he personality, delivery and tone of voice is not professional. [Bowman] shows no respect to his manager, sends e-mails that make demands and keeps a constant division in our team with his verbal outburst[s] to other team managers," and "[Bowman] has negative verbal conversations about his teammate managers, he will not answer his company cell phone at times and takes hours to call us back. He did not want to participate more than 8 [hours] a day for preparing for an audit we were having. [Bowman] verbally says that staff meetings are a waste of his time. . . . [Bowman] becomes verbally combative when confronted on issues and has repeatedly made false complaints about other managers. [Bowman] has displayed inappropriate behavior toward other Managers from other departments and has not maintained a civil and courteous behavior." (Dkt. No. 17, Attach. 8 at 3-5, 12.)

Dkt. No. 17, Attach. 7 at 2.)

By December 2010, Bowman's job performance appears to have plummeted, as evidenced by a series of emails sent by Sams to Bowman. (*See generally* Dkt. No. 17, Attach. 9.)  For example, on December 8, Sams sent Bowman an email explaining that there were "serious issues with the payroll," which was Bowman's responsibility.  (*Id.* at 2.)  On December 10, Sams sent Bowman an email stating that Sams "had to make multiple adjustments and approvals to the pay because [Bowman] failed to do so by the close of the approval period," and warned Bowman that "[t]his is not acceptable by any means."  (*Id.* at 7.)  Again, on December 15, Sams emailed Bowman about issues with his employees' time entries; Sams indicated that these errors were "directly effecting [sic] . . . employees['] paychecks and their attitudes."  (*Id.* at 9.)  On December 16, Sams sent Bowman another email noting that a vehicle was damaged, and that Bowman failed to complete a vehicle inspection report.  (*Id.* at 11.)  On December 20, Sams sent Bowman three separate emails documenting several additional issues, including Bowman's failure to: (1) follow proper procedure for asking for time off; (2) communicate with Sams and promptly

return phone calls; (3) enter operational tests;[5] and (4) complete an "Areas of Responsibility" report.[6]  (*Id.* at 13-17.)  On December 21, Sams sent Bowman two more emails, one regarding a defective car and several errors that violated company policy and Federal Railway Administration regulations, and another regarding a report that Bowman drafted that was incomplete and inaccurate.[7]  (*Id.* at 19-21.)

## D.    Events Leading Up to Bowman's Termination

On December 28, Sams sent Bowman another email, which triggered a series of events that ultimately led to Bowman's termination.  (Def.'s SMF ¶¶ 20-43.)  The email, which Sams sent at 2:15 P.M., stated that although Sams "gave clear instructions that the Managers [vehicle] was not to be used unless [he] gave direct permission," Bowman "allowed the [vehicle] to

---

[5] In this email, Sams stated that Bowman "can not continue to fail in this area."  (Dkt. No. 17, Attach. 9 at 15.)

[6] In this email, Sams noted that he had spoken to Bowman "multiple times about [his] failure to comply" and stated that he "will not continue to accept [Bowman's] disregard for [his] managerial duties."  (*Id.* at 17.)

[7] Notably, in the email regarding the inaccurate and incomplete report, Sams stated that he has "spoke[n] with [Bowman] before about complete and accurate reporting multiple times, this is more than redundant . . . I can not continue to accept the sub par reporting and I personally have spoke[n] with you, shown you, instructed you, given you examples, etc.[,] etc.[,] etc."  (*Id.* at 21-22.)

7

be used . . . and did not request permission."[8]  (Dkt. No. 17, Attach. 9 at

23.)  The email went on to note that there was no inspection report for that

vehicle, and that Bowman "continue[s] to fail at following instructions and

show[s] complete disregard for company policy and any instructions that

are given no matter how clear they might be or who they are from."  (*Id.*)

Upon reading the email, Bowman laughed.  (Def.'s SMF ¶ 21; Dkt.

No. 17, Attach. 2 at 63.)  Sams was present when Bowman laughed, and

the two then engaged in a "heated meeting."  (Def.'s SMF ¶ 21; Dkt. No.

17, Attach. 2 at 64.)  Although Bowman testified that he does not

remember exactly what was said during the conversation, at 3:09 P.M. on

the same day, Sams sent Hensley and Murphy an email memorializing his

discussion with Bowman.  (Dkt. No. 17, Attach. 10 at 2-3.)  In that email,

Sams reported that Bowman raised his voice, used profanity, and

"show[ed] very aggressive body language," despite Sams' requests that

_____

[8] Sams also sent Bowman a second email on December 28.  (Dkt.
No. 17, Attach. 14 at 3-4.)  This email explained that Sams had issues with
Bowman's car per man (CPM) graph and his email turnover.  (*Id.*)  Sams
stated that it appeared as if Bowman was "trying to misconstrue [his]
numbers to be more favorable than they are which is clearly dishonest and
unethical."  (*Id.*)  The next day, Sams forwarded that email to Timothy
Collins, CSXT's Chief Mechanical Officer for Car Operations.  (Def.'s SMF
¶ 29; Dkt. No. 17, Attach. 14 at 2-3.)

Bowman conduct himself in "a civil and courteous, professional manner." (*Id.*) Ultimately, Sams told Bowman to report to Hensley's office immediately, which Bowman did. (*Id.* at 3.)

Again, while Bowman does not remember the exact words exchanged in Hensley's office, (Dkt. No. 17, Attach. 2 at 65-67), the next day—December 29, 2010—at 8:49 P.M., Hensley memorialized his conversation with Bowman, (Dkt. No. 17, Attach. 11 at 2). According to his account, Hensley explained that Bowman's word choice and tone in his conversation with Sams was inappropriate. (*Id.*) Also according to Henlsey's report, Bowman claimed that Sams and Hensley "blackballed him" and that he wished Sams and Hensley "would go ahead and fire him." (*Id.*)

Around 1:00 P.M. on December 29, when Bowman was driving to his 3:00 P.M. shift, he had a panic attack, fell ill, and called Hensley to inform him that he would not be at work that day so that he could visit his doctor for his blood pressure issues. (Compl. ¶ 9; Def.'s SMF ¶ 30; Dkt. No. 17, Attach. 2 at 67-69.) On the same day, Bowman sent a text message to Sams stating that he would not be at his 3:00 P.M. shift and would be going to the doctor. (Def.'s SMF ¶ 32; Dkt. No. 17, Attach. 26 at 2.) Sometime

thereafter, Sams responded and requested a doctor's excuse when Bowman returned.  (Dkt. No. 17, Attach. 26 at 3.)  Bowman replied, "I will not.  Private."  (*Id.* at 4.)

At 2:51 P.M. on December 29, Sams contacted CSXT Human Resources Manager, Terri Schray, requesting her help with "an issue that needs [to be] addressed ASAP with Mr. Bowman."  (Dkt. No. 17, Attach. 12 at 2.)  Later that day, Schray sent an email to Richard Greenwood regarding the email she received from Sams.  (Dkt. No. 17, Attach. 13 at 2.)  Schray noted that Bowman was their "lowest performer in Mechanical for end-of-year," that "his performance failures . . . [are] well documented," and that, although "he is in line to receive a performance warning at end-of-year," she recommended that they "remove him from service until this situation can be brought before the Review Committee for termination" because she didn't "think they need[ed] to tolerate this type of behavior." (*Id.*)

The next day, December 30, at 8:01 A.M., Greenwood responded and suggested that Hensley and Sams immediately discuss the situation with Bowman, take him out of service pending disciplinary review, and then decide on a discipline recommendation—either a final written warning or

termination.  (*Id.*)  Given Bowman's history of poor performance, coupled with insubordinate behavior, however, Greenwood noted that they "might want to proceed right to termination."  (*Id.*)  By 8:18 A.M. on the same day, CSXT's Chief Mechanical Officer for Car Operations, Timothy Collins, who was aware of some of Bowman's performance deficiencies and the December 28 confrontation between Sams and Bowman, remarked to Schray that Bowman "total[ly] lack[s] ethical managerial performance." (Def.'s SMF ¶ 29; Dkt. No. 17, Attach. 14 at 2-3.)  Collins also exclaimed that, after Bowman's confrontation with Sams, Bowman "report[ed] off sick!"[9]  (Dkt. No. 17, Attach. 14 at 2.)

Also on December 30, Bowman saw his doctor, Dr. Padma Sripada, at which time Dr. Sripada generated a note excusing Bowman from work "due to medical reasons from 12/29/10 to 1/31/2011."[10]  (Def.'s SMF ¶ 33; Pl.'s Counter SMF ¶ 14; Dkt. No. 17, Attach. 16 at 2.)  Bowman claims he

---

[9] The court also notes that Murphy, Schray, and Sams stated that Bowman often called in sick after being disciplined, but none could remember a specific instance when this occurred.  (Pl.'s Counter SMF ¶¶ 38-39; Dkt. No. 17, Attach. 3 at 83-84; Dkt. No. 17, Attach. 17 at 45-47; Dkt. No. 21, Attach. 12 at 24-25.)

[10] This note, however, is inexplicably dated September 8, 2011. (Dkt. No. 17, Attach. 16 at 2.)

faxed the note to Murphy one or two days later.[11]  (Def.'s SMF ¶ 35; Dkt.

No. 17, Attach. 16 at 2.)  After he faxed the doctor's note, Bowman did not

communicate with anyone at CSXT until February 1, 2011, except at some

point, he received another text message from Sams, which directed

Bowman "to contact Met-Life to provide the necessary documentation in

order to avoid disciplinary measures," because of "what appears to be a

reoccurring medical condition."  (Def.'s SMF ¶ 36; Pl.'s Counter SMF ¶ 19;

Dkt. No. 17, Attach. 15 at 5.)

## E.  Bowman's Termination

Although the parties dispute which disciplinary procedures were

proper under these circumstances, (Def.'s SMF ¶¶ 38-39; Pl.'s Counter

SMF ¶¶ 31-32), the events that followed leading up to Bowman's

termination are generally undisputed.  On January 5, 2011, Schray emailed

Patricia Willis, who is responsible for coordinating the Disciplinary Review

Panel (DRP), which is charged with reviewing employees' behavior.  (Def.'s

SMF ¶ 40; Dkt. No. 17, Attach. 18 at 2-3.)  In her email to Willis, Schray

noted that Bowman is "an individual that [she has] had conversations with

Managers about since 2009," and that although she has "insisted [that the

---

[11] The fax date, also inexplicably, is September 13, 2011.  (*Id.*)

managers] spend the extra time coaching [Bowman] and looking for opportunities to develop and improve his performance since 2009" and even though "at times he was improving," she concluded that "he clearly isn't capable of sustaining improvement."[12]  (Dkt. No. 17, Attach. 18 at 2.)

Schray and Willis then scheduled a DRP for January 7, 2011; Schray prepared a packet of information on Bowman for the DRP's review.  (Def.'s SMF ¶¶ 40-41; Dkt. No. 17, Attach. 19.)  The recommendation submitted to the DRP was "termination for unacceptable performance coupled with insubordinate behavior."  (Def.'s SMF ¶ 42; Dkt. No. 17, Attach. 19 at 3.) On January 18, 2011, Schray advised Katrina Feliciano, CSXT Benefits Manager, that Bowman's termination had been approved.  (Def.'s SMF ¶ 43; Dkt. No. 17, Attach. 20 at 2.)  At that time, Bowman had submitted a claim for short-term disability (STD) benefits through MetLife, but his claim was pending approval.  (Dkt. No. 17, Attach. 20 at 2.)  On January 26, 2011, Bowman's STD claim was approved for the period of December 30,

---

[12] Schray also noted, and Bowman points out here, that Bowman had never been on a performance improvement plan (PIP), he never was issued a performance warning, and there was no signed documentation of conversations being held with him.  (Dkt. No. 17, Attach. 18 at 2; Pl.'s SMF ¶ 35.)  Nevertheless, Schray concluded that, despite those considerations, she did not "expect Managers should have to tolerate someone" like Bowman.  (Dkt. No. 17, Attach. 18 at 2.)

2010 to February 6, 2011.  (Def.'s SMF ¶ 44.)  The exact date that

Bowman was notified of his termination and the extent to which CSXT

received substantive information about Bowman's medical condition are

both disputed.  (Def.'s SMF ¶ 44; Pl.'s Counter SMF ¶ 41; Def.'s Resp. to

Pl.'s Counter SMF ¶ 41.)

### III.  Standard of Review

The standard of review pursuant to Fed. R. Civ. P. 56 is well

established and will not be repeated here.  For a full discussion of the

standard, the court refers the parties to its decision in *Wagner v. Swarts*,

827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v.*

*Sprague*, 489 F. App'x 500 (2d Cir. 2012).

### IV.  Discussion

Bowman asserts claims of interference and retaliation, both in

violation of the FMLA.  (Compl. ¶¶ 16-23, 24-27.)  CSXT argues that it is

entitled to summary judgment dismissing both claims.  (Dkt. No. 17, Attach.

29 at 5-24.)  The court agrees with CSXT.  Each claim is discussed in turn

below.

### A.  Interference

Bowman's first claim is one for interference in violation of the FMLA.

14

(Compl. ¶¶ 16-23.)  Specifically, Bowman claims that he "lost the ability to use his remaining two weeks of qualified FMLA leave when his position was terminated."  (*Id.* ¶ 19.)  CSXT argues that Bowman cannot establish a prima facie case of FMLA interference.  (Dkt. No. 17, Attach. 29 at 5-15.)  In particular, CSXT contends that Bowman failed to provide CSXT with adequate notice of a serious medical condition, and, even if his notice was sufficient, he failed to show that he was entitled to any future FMLA benefits, as he would have been terminated whether or not he took FMLA leave.  (*Id.*)  Although the court finds a disputed issue of material fact with respect to whether Bowman's notice was sufficient, the court agrees that Bowman failed to show entitlement to future FMLA benefits.

Under 29 U.S.C. § 2615(a)(1), "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  An employee may bring an interference claim against the employer when "the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA."  *Nichik v. N.Y.C. Transit Auth.*, No. 10-CV-5260, 2013 WL 142372, at *12-13 (E.D.N.Y. Jan. 11, 2013) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006)).  To

state a prima facie claim for interference under the FMLA, Bowman must allege: (1) he is an eligible employee; (2) CSXT qualifies as an employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he gave notice to the defendant of his intention to take leave; and (5) CSXT denied him benefits to which he was entitled under the FMLA. *See Nally v. New York*, No. 1:10-CV-1186, 2013 WL 2384252, at *11 (N.D.N.Y. May 30, 2013); *Brown v. Pension Bds.*, 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007).

### 1.    Notice

Assuming Bowman was entitled to take leave, he was obligated to provide CSXT with notice.  Under the FMLA, employees are required to provide, whenever possible, at least thirty days' notice for leave that is foreseeable.  *Brown*, 488 F. Supp. 2d at 408 (citing 29 U.S.C. § 2612(e)(1); 29 C.F.R. § 825.302(a)).  Where the need for leave has arisen unexpectedly, "an employee must provide notice to the employer [of the need for FMLA] leave as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).  "[T]he employee need not expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.303(b).

Once sufficient notice has been provided, the burden then shifts to the employer, which "will be expected to obtain any additional required information through informal means." *Id.* "[T]he employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1036-1037 (8th Cir. 2010) (citations omitted). "The employee seeking FMLA leave must provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." *Id.* at 1037 (internal quotation marks and citations omitted). "Indeed, the FMLA places a significant burden on the employer to both make itself aware of the FMLA's dictates and to inform its employees of their rights under the FMLA." *Nally*, 2013 WL 2384252, at *13 (citing *Slaughter v. Am. Bldg. Maint. Co. of N.Y.*, 64 F. Supp. 2d 319, 325 (S.D.N.Y. 1999). While an employee's statements may trigger the employer's duty to inquire, "the employer is not required to be clairvoyant." *Id.* (quoting *Brohm v. JH Prop., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) (internal quotation marks omitted)).

Here, on December 29, 2010, Bowman called Hensley and informed him that he would be out sick so that he could see his doctor for blood

pressure issues and he also sent a text message to Sams, informing him that he would be out of work so that he could see a doctor. (Compl. ¶ 9; Def.'s SMF ¶ 30.) Additionally, two or three days later, Bowman faxed Dr. Sripada's note, excusing him from work for approximately one month due to "medical reasons." (Def.'s SMF ¶ 35; Dkt. No. 17, Attach. 16 at 2.) CSXT argues that the doctor's note, coupled with Bowman calling in sick, was not enough to put CSXT on notice that Bowman's leave was related to a serious health condition. (Dkt. No. 17, Attach. 29 at 6-13.) Bowman counters that he provided ample notice, and that, in fact, the burden shifted to CSXT to inquire further into Bowman's need for FMLA leave. (Dkt. No. 21, Attach. 32 at 6-14.)

The court has serious doubts about whether notice here was sufficient, particularly because some courts have found notice to be insufficient under circumstances in which the employer had more information than CSXT did here. *See, e.g.*, *Brown*, 488 F. Supp. 2d at 490 (holding that the plaintiff's phone calls, doctor's note, the defendant's conversations with the plaintiff's sister and mother, and an additional physician's letter, taken collectively, did not constitute adequate notice under the FMLA). Nevertheless, while the court notes that calling in sick,

18

by itself, is insufficient to put an employer on notice, *see, e.g.*, 29 C.F.R. § 825.303(b); *Brown*, 488 F. Supp. 2d at 409, Bowman did more than call in sick.  Indeed, Dr. Sripada's note, which excused Bowman from work for *an entire month* due to medical reasons, may have been enough to put CSXT on notice of Bowman's need for FMLA leave, even though the note did not elaborate on Bowman's exact condition.  Dr. Sripada's note, along with Bowman's communications with Sams and Hensley, at least create an issue of material fact as to whether notice was sufficient.  Further, Sams' text message to Bowman, in which Sams appears to have acknowledged Bowman's "reoccurring medical condition," creates even more ambiguity as to whether Bowman's notice was sufficient.  (Pl.'s Counter SMF ¶ 19; Dkt. No. 17, Attach. 15 at 5.)  Accordingly, summary judgment for CSXT is not appropriate on the sufficiency of Bowman's notice.

     2.    *Denial of Benefits To Which Bowman Was Entitled*

Assuming, without deciding, that his notice was sufficient, in order to make out a prima facie case for interference, Bowman must also establish that he was denied benefits to which he was entitled.  *See Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 336 (E.D.N.Y. 2010).  Bowman claims that CSXT "interfered with his FMLA rights when they terminated

him, despite the fact that he was legally entitled to additional FMLA

leave."[13]  (Compl. ¶¶ 16-23; Dkt. No. 21, Attach. 32 at 15.)  CSXT,

however, argues that Bowman has failed to show that he was denied

benefits to which he was entitled because he would have been terminated

regardless of taking FMLA leave.  (Dkt. No. 17, Attach. 29 at 13-15.)  The

---

[13] Bowman also appears to argue that it was CSXT's failure to provide him with notice of his FMLA rights that gives rise to his interference claim.  (Dkt. No. 21, Attach. 32 at 12-14.)  In support of this theory, Bowman cites a Third Circuit case, *Conoshenti v. Pub. Service Elec. & Gas Co.*, 364 F.3d 135, 143 (3d Cir. 2004), which noted that it is "reasonable" to suggest "that a failure to advise of FMLA rights could constitute an interference" with an employee's FMLA rights.  *Id.*  In further support of his argument, Bowman points to a determination issued by an investigator from the United States Department of Labor, which concluded that CSXT failed to provide Bowman with eligibility notice to take FMLA leave within five business days of when he informed CSXT that he would need to be out on sick leave for thirty days.  (Dkt. No. 21, Attach. 24; Dkt. No. 21, Attach. 32 at 14.)  The Second Circuit, however, does not appear to have weighed in on this issue, and the court declines to expand the reach of interference claims in the absence of Second Circuit guidance, especially because CSXT's duties are triggered only after Bowman provided notice of his need for FMLA leave, and as discussed above, the court is not convinced that Bowman provided sufficient notice.  Moreover, this appears to be the first time that Bowman has framed his interference claim in this way, and the court therefore finds it inappropriate to consider any further.  *See Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims." (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n.9 (3d ed. 2004))).  Finally, admissibility issues aside, the court does not find that the Department of Labor's determination is relevant to whether Bowman's FMLA leave was a negative factor in CSXT's determination to fire him.

court agrees with CSXT, and concludes that Bowman's interference claim must be dismissed.

The Second Circuit has indicated that, in order to prove an interference claim, a plaintiff must show that the defendant "considered [the plaintiff's] FMLA leave . . . a negative factor in its decision to terminate him." *Sista*, 445 F.3d at 176; *see Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011). "[I]t is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." *Pearson*, 785 F. Supp. 2d at 162; *see Sista*, 445 F.3d at 176 (noting that "the FMLA gives no greater job security than that to which the employee would have been entitled prior to taking leave" (internal quotation marks and citation omitted)); *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005) ("As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) ("FMLA is not a shield to protect employees from legitimate disciplinary

action by their employers if their performance is lacking in some manner unrelated to their FMLA leave.").

Here, Bowman cannot establish that he was discharged for taking FMLA leave, or that it was a "negative factor" in CSXT's decision to fire him.[14] *Sista*, 445 F.3d at 176. Indeed, as discussed more fully below, the overwhelming evidence shows that Bowman was terminated for his well-documented poor performance and insubordinate behavior, which appears to have reached a breaking point during Bowman's confrontation with Sams on December 28, 2010. (Dkt. No. 17, Attach. 18 at 2; Dkt. No. 17, Attach. 19.) In fact, the record shows that CSXT was considering taking disciplinary action against Bowman before he even called in sick on December 29, 2010. ( Dkt. No. 17, Attach. 10 at 2-3; Dkt. No. 17, Attach. 13 at 2.) Accordingly, Bowman's interference claim against CSXT must be dismissed.

**B.    Retaliation**

_____

[14] Bowman insinuates that Schray and Murphy's testimony that one of the problems with Bowman was that he "called in sick following any corrective action" indicates that CSXT viewed Bowman's FMLA leave as a negative factor in its decision to terminate him. (Dkt. No. 21, Attach. 32 at 15; Pl.'s Counter SMF ¶¶ 30, 37, 40.) As discussed below, the court disagrees.

Bowman's second cause of action is one for retaliation in violation of the FMLA. (Compl. ¶¶ 24-27.) Specifically, Bowman claims that "[a]fter utilizing, and/or attempting to use, FMLA qualified leave, [Bowman] was terminated from his position," and "[t]he decision to terminate [him] was made because of his use, and/or attempted use of FMLA qualified leave." (*Id.* ¶¶ 25-26.) CSXT argues that Bowman's claim for retaliation must be dismissed. (Dkt. No. 17, Attach. 29 at 15-24.) In particular, CSXT argues that Bowman cannot establish a prima facie case of retaliation, and that even if he can, CSXT had legitimate, nonretaliatory reasons for terminating him, and Bowman cannot prove that those reasons were pretextual. (*Id.*) The court agrees with CSXT.

FMLA retaliation claims are analyzed under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Potenza v. City of N.Y*, 365 F.3d 165, 168 (2d Cir. 2004). To establish a prima facie case of FMLA retaliation, a plaintiff must establish that: (1) "he exercised rights protected under the FMLA," (2) "he was qualified for his position," (3) "he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory

intent." *Id.*

A presumption of retaliation is created if the plaintiff satisfies his initial burden, and the burden of production then shifts to the defendant to state a legitimate, non-discriminatory reason for the adverse employment action. *See Tomici v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 472, 490 (E.D.N.Y. 2012) (citing, *inter alia*, *Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir. 2001)). "The employer's burden is merely one of production, not persuasion." *Id.* (internal quotation marks and citations omitted). If the defendant meets its burden of production, "the presumption of discrimination drops out" and the burden then shifts back to the plaintiff "to establish by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

   1.   *Bowman's Prima Facie Case*

First, CSXT argues that Bowman cannot show that he exercised rights protected by the FMLA. (Dkt. No. 17, Attach. 29 at 17-18.) CSXT contends that, because Bowman never requested FMLA leave or apprised CSXT of his serious health condition, he did not use or attempt to use FMLA-qualified leave. (*Id.*) Bowman counters that he gave adequate

notice of his need for FMLA-qualified leave, and that, if any party was deficient in providing notice, it was CSXT. (Dkt. No. 21, Attach. 32 at 17.) Because there is a question of fact with respect to whether Bowman's notice was sufficient, (*see supra* Part IV.A.1), the court similarly finds a question of fact with respect to whether Bowman exercised rights protected by the FMLA.

Second, CSXT argues that Bowman cannot raise an inference of a retaliatory intent because "the single fact he can offer in support of his retaliation claim is that he was terminated while he was on sick leave," which "is insufficient as a matter of law." (Dkt. No. 17, Attach. 29 at 18-22.) Bowman, however, contends that he has offered more evidence than just temporal proximity that supports an inference of retaliatory intent, including the facts that "his medical leave was cited as a major reason for his termination,"[15] that he had never been absent in violation of CSXT policy, and that he was never subject to any discipline for absence-related issues. (Dkt. No. 21, Attach. 32 at 17-18.)

_____

[15] The record does not support that Bowman's medical leave was cited as a major reason for termination. Instead, the record shows that Murphy, Schray, and Sams stated that Bowman often called in sick after being disciplined. (Pl.'s Counter SMF ¶¶ 38-39; Dkt. No. 17, Attach. 3 at 83-84; Dkt. No. 17, Attach. 17 at 45-47; Dkt. No. 21, Attach. 12 at 24-25.)

The Second Circuit has held that a retaliation plaintiff can establish a causal nexus by showing that "the protected activity was followed closely by discriminatory treatment, . . . or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, . . . or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted). Temporal proximity can be sufficient to create an inference of retaliatory intent. *See Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (denying summary judgment based on the "'very close" proximity—ten days—between plaintiff's return from FMLA leave and defendant's negative evaluation of his performance) (internal quotation marks and citations omitted)*; Terry v. Cnty. of Cayuga*, No. 5:11-CV-1296, 2013 WL 5464395, at *5 (N.D.N.Y. Sept. 30, 2013) (noting that plaintiff was terminated on the day she returned from FMLA leave, and finding that "[s]uch close temporal proximity generally gives rise to an inference of retaliation").

Here, Bowman claims he was terminated while he was out on FMLA leave, with two weeks of FMLA leave remaining. (Compl. ¶¶ 18, 19, 25.)

The court concludes that this temporal proximity is sufficient, at this stage of the analysis, to give rise to an inference of retaliatory intent. Accordingly, the burden now shifts to CSXT.

   2.   *CSXT's Legitimate, Nonretaliatory Reasons for Termination*

CSXT argues that, even if Bowman could establish a prima facie case of retaliation, CSXT is entitled to summary judgment because it has set forth legitimate, nonretaliatory reasons for terminating him.  (Dkt. No. 17, Attach. 29 at 22.)  The court agrees.

   Assuming that Bowman established a prima facie case, CSXT has demonstrated that it terminated Bowman due to his unacceptable performance coupled with his insubordinate behavior.  From 2008 to 2010, Bowman's PMRs reflect a history of Bowman's inability to work with both his peers and supervisors in a civil, professional manner.  (*See, e.g.*, Dkt. No. 17, Attach. 5 at 7; Dkt. No. 17, Attach. 6 at 7, 8; Dkt. No. 17, Attach. 8 at 4-5, 10-11, 13-14.)  Bowman himself described his working relationship with Sams as "hostile," and negative from the very beginning, deteriorating even further over the next two years.  (Dkt. No. 17, Attach. 2 at 28.)  Their relationship reached its breaking point on December 28, 2010, when Bowman and Sams got into their final argument over Sams' emails

regarding Bowman's use of the Manager's vehicle, CPM graph, and email turnover.  (Def.'s SMF ¶¶ 20-43; Dkt. No. 17, Attach. 2 at 64; Dkt. No. 17, Attach. 9 at 23; Dkt. No. 17, Attach. 14 at 3-4.)

Particularly throughout 2010, in addition to his poor behavior, Bowman's PMR and various emails from Sams demonstrate Bowman's chronically poor performance.  (*See, e.g.*, Dkt. No. 17, Attach. 5; Dkt. No. 17, Attach. 6; Dkt. No. 17, Attach. 8; Dkt. No. 17, Attach. 9.)  Indeed, on various occasions, emails from Sams reflect, among other things, Bowman's errors with payroll and employees' time entries, incomplete or inaccurate reports, including vehicle damage reports and "Areas of Responsibility" reports, and failure to return phone calls.  (*See generally* Dkt. No. 17, Attach. 9.)  By the end of 2010, Bowman's year-end evaluation score rendered him the lowest scoring employee in the department.  (Dkt. No. 17, Attach. 13 at 2.)  Accordingly, CSXT has demonstrated legitimate, nonretaliatory reasons for Bowman's termination.

### 3.    Pretext

Because CSXT has offered legitimate, nonretaliatory reasons for terminating Bowman, Bowman must prove that those reasons were pretextual.  *Tomici*, 910 F. Supp. 2d at 490.  CSXT argues that Bowman

has failed to show that its stated reasons for termination were pretextual. (Dkt. No. 17, Attach. 29 at 22-23.) Bowman, however, argues that the temporal proximity of his FMLA leave and termination, coupled with the facts that CSXT showed discriminatory animus toward Bowman for taking leave and he had never been formally disciplined, shows pretext. (Dkt. No. 21, Attach. 32 at 20.) The court agrees with CSXT.

First, with respect to temporal proximity, "[n]o FMLA violation occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave." *Kennebrew v. N.Y.C. Hous. Auth.*, No. 01 CIV 1654, 2002 WL 265120, at *19 (S.D.N.Y. Feb. 26, 2002); *see Beno v. United Tel. Co. of Fla.*, 969 F.Supp. 723, 726 (M.D. Fla. 1997) ("Before [plaintiff] requested medical leave, her supervisors had already . . . recommended her termination. Thus, [the plaintiff's] allegation of pretext—that she was terminated because of her request for medical leave—is undermined by the undisputed fact that [the employer's] steps toward termination were already underway before [the plaintiff] requested leave."); *Tuberville v. Pers. Fin. Corp.*, No. 3:95CV150, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996) ("In a case such as this, with a well-documented history of unsatisfactory performance, and where the

wheels of termination were put in motion before the request for leave," the FMLA provision requiring the employer to restore the employee to prior job does not apply).

Here, CSXT claims that, although Bowman was terminated while out on leave, the disciplinary process was initiated prior to Bowman notifying his supervisors of his need for leave. (Dkt. No. 17, Attach. 29 at 20-21.) Bowman disputes this fact. (Dkt. No. 21, Attach. 32 at 19.) It is clear, however, that prior to notifying his supervisors of his need for leave, Bowman was in line to receive a performance warning at the end of the year. (Dkt. No. 17, Attach. 13 at 2.) Bowman and Sams' confrontation on December 28, 2010 then escalated the disciplinary process. (*Id.*; Dkt. No. 17, Attach. 10; Dkt. No. 17, Attach. 12 at 12.) Immediately after the events on December 28, 2010, Sams and Schray took steps to initiate Bowman's termination. (Dkt. No. 17, Attach. 10; Dkt. No. 17, Attach. 12 at 12; Dkt. No. 17, Attach. 13 at 2.) Before Bowman called in sick on the afternoon of December 29, 2010, Sams had already sent an email to Hensley and Murphy documenting his interaction with Bowman. (Dkt. No. 17, Attach. 10.) Additionally, before Bowman faxed his doctor's note, Schray had already suggested proceeding to termination. (Dkt. No. 17,

Attach. 13 at 2.)  Accordingly, the "wheels of termination," *Tuberville*, 1996 WL 407571, at *3, were in motion before Bowman requested FMLA leave, and Bowman's reliance on temporal proximity fails to establish pretext.

Next, Bowman claims that Sams, Murphy, and Schray's statements that Bowman often called in sick after corrective action is evidence of discriminatory animus.  (Dkt. No. 21, Attach. 32 at 17-18, 20-21.)  While employer comments or actions evincing animus towards FMLA leave can create an inference of retaliation, *Terry*, 2013 WL 5464395, at *6, the court does not view these statements as evidence that CSXT negatively viewed Bowman's FLMA leave.  To the extent that CSXT actually believed that Bowman was being disingenuous by calling in sick after corrective action on previous occasions, that fact has nothing to do with whether CSXT viewed Bowman's FMLA leave as a negative factor.  *See Worster v. Carlson Wagonlit Travel, Inc.*, No. 3:02 CV 167, 2005 WL 1595596, at *4 (D. Conn. July 6, 2005), *aff'd*, 169 F. App'x 602 (2d Cir. 2006).

Finally, Bowman claims that his past performance and lack of previous formal discipline is evidence of pretext.  (Dkt. No. 21, Attach. 32 at 19-21.)  CSXT argues that the several emails Bowman received in December 2010 were informal warnings, sufficient to put a reasonable

employee on notice that his performance was deficient. (Dkt. No. 22, Attach. 1 at 5-6.) The court agrees; the emails sent by Sams to Bowman, which admonished Bowman that his incomplete and inadequate reports would not be tolerated and that he "cannot continue to fail," were informal warnings. (Dkt. No. 17, Attach. 9 at 15, 17.) Further, "the fact that [a plaintiff] received satisfactory performance reviews prior to . . . FMLA leave is not sufficient to create a genuine issue of material fact." *Mercer v. Arc of Prince Georges Cnty., Inc.*, No. 13-1300, 2013 WL 3470489, at *6 (4th Cir. July 11, 2013). Accordingly, the court finds that Bowman has failed to show that CSXT's legitimate, nonretaliatory reasons for termination were pretextual, and concludes that CSXT is entitled to summary judgment with respect to Bowman's retaliation claim. Thus, CSXT's letter motion requesting oral argument is denied as moot.

## V. **Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that CSXT's motion for summary judgment (Dkt. No. 17) is **GRANTED** and all claims against CSXT are dismissed; and it is further

**ORDERED** that CSXT's letter motion requesting oral argument on its motion for summary judgment (Dkt. No. 16) is **DENIED** as moot; and it

is further

      **ORDERED** that the Clerk close this case; and it is further

      **ORDERED** that the Clerk provide a copy of this Memorandum-

Decision and Order to the parties.

**IT IS SO ORDERED.**

May 22, 2014
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court